# Complaint against Pierre-Yves Kolakowski

# Filed by Peter Lundstedt on 7-25-2018

## Summary

Deutsche Bank (DB) was Trustee AND Owner of the Long Beach Mortgage Loan Trust 2006-10 that held plaintiff Lundstedts' 9-25-2006 $1,000,000 Original Note and Security Instrument, in EXHIBIT 2 page 3, AND the parties 5-1-2008 Modified $1,072,000 Note and Security Instrument in EXHIBIT 5 that was collateralized by plaintiff Lundstedts' home in Greenwich, CT.

The Modification was created by DB as Trustee who insisted that plaintiff Lundstedt sign it in May of 2008, who did so, but only under duress of ejection and foreclosure from DB and WaMu, and only then did plaintiff Lundstedt reluctantly agree to the 5-1-2008 terms, see EXHIBIT 5.

That, "signed and notarized 2008 agreement", created a new installment contract and a new starting point for the 5-1-2008 new materially modified installment contract terms and conditions.

The DB and Plaintiff Lundstedt 5-1-2008, Jointly Signed, "Operative" Note and Security Instrument had different "Material" Terms, Duration and Face Amount that replaced the terminated Original 9-25-2006 installment contract terms and conditions. The 2006 "Terminated" Invalid Note and Security Instrument with Materially different Terms, Duration and a different Face Amount was "replaced" by the 2008 Materially different Terms, Duration and Face Amount Note and Security Instrument contract.

Subsequently, on 12-18-2008, Chase directed DB to file a complaint of foreclosure on the 9-25-2006 Terms, Duration and Face Amount, that were terminated, but did not disclose the Modified Operative Materially different Terms, Duration and Face Amount agreed to on the new 5-1-2008 agreement insisted upon by DB.

DB as Trustee changed plaintiff Lundstedts' monthly required Principle and Interest payment "UP", from $9,636.75 to $10,250.94, when plaintiff Lundstedt could only afford $500 a month. DB as Trustee then put in an indemnification clause in the Modified Note for any wrong doing committed by DB in the Original Note whose 9-25-2006 terms and conditions were then terminated on 5-1-2008.

What DB should have done in 2008 was give plaintiff Lundstedt a loan he could afford so that he could prosper rather than be subjected to five years of collection harassment from Chase at the direction of DB as Trustee and Owner of the Note.

DB as Trustee and Pierre-Yves Kolakowski concealed, omitted and did not disclose the materially different Modified Note from the 12-18-2008 foreclosure filing.

DB as Trustee and Pierre-Yves Kolakowski concealed, omitted and did not disclose the materially different Modified Note from the Town of Greenwich, CT Land Records.

But, consider that in a recent federal court case between the parties, Chase filed, as an exhibit at trial, the 5-1-2008 Modified Contact as evidence, and omitted the 9-25-2006 Original Note and Security Instrument that Chase and DB claimed was the operative Note in their 12-18-2008 foreclosure complaint!

So, in DB's 12-18-2008 foreclosure complaint against plaintiff Lundstedt in 2008, Chase instructed DB a file on the Original 9-25-2006 tainted Note with terminated material Terms and Conditions, thereby deliberately concealing and omitting the 5-1-2008 tainted Modified Note that represented the legal contract between the parties. The Modified contract was created by DB as the Trustee who insisted that plaintiff Lundstedt sign it in 2008 under duress.

BUT then, in plaintiff Lundstedts' 2013 complaint filed against DB and Chase, Chase, at the 2018 trial, discloses the 2008 Modified Note representing the Modified Note was the parties contractual agreement, and then, incredibly, conceals and omits the 9-25-2006 Original Note from the 2018 trial exhibits that they used in their 12-18-2008 foreclosure complaint that omitted the 5-1-2008 Modified Note.

Chase and DB admitted into evidence only the Original 2006 Note, and omitted the 2008 Modified Note, in the parties 2008 state case, BUT THEN omit the Original 2006 Note and admitted the 2008 Modified Note in the parties' 2013 case giving the appearance that the operative contract was the modified 2008 contract that they concealed from the 2008 state case.

So Chase and DB, in the 2008 CT state case, represented that the parties binding agreement with four corners was the 2006 Original agreement signed on 9-25-2006, but then represent in the 2018 federal case the parties binding agreement with four corners was the 2008 Modified agreement signed on 5-1-2008. Yet Chase and DB

omitted the 2008 Modified Note in the 2008 state case and admitted it in the 2013 case.

That opens the door for examination of the contracts on review, appeal or in a new trial on the 2013 federal case.

Oct 24, 2013  Deutsche Banks' attorney, Pierre-Yves Kolakowski, allegedly had a junior member of his firm, Annabelle T. Machado-Costa, Esq., sign the false Foreclosure Certificate, in EXHIBIT 2 page 27, that the 9-25-2006 Original Terms, Conditions, Face Value and Duration EXHIBIT 2 page 3 was valid.

Pierre-Yves Kolakowski knew the *Materially Different 5-1-2008 Modified Terms*, Conditions, Face Value and Duration in EXHIBIT 5 was *highly unsuitable* for Mr. Lundstedt and illegal.

In other words, Pierre-Yves Kolakowski as supervisor and his firm knew that they Certified a Foreclosure that had expired Terms, Conditions, Face Value and Duration, in scienter.

This Certificate of Foreclosure Certified *the terminated invalid unlawful "terms* and agreements" of 9/26/2006.  Pierre-Yves Kolakowski as supervisor and his firm then filed the false foreclosure certification in the Town of Greenwich Land Records by, when the only legal or valid "terms and agreement" were those signed to  on 5/6/2008 by Deutsche Bank as Trustee.

----------------------------------------

## Lundstedt CFPB Complaint

## Against Duetsche Bank, Fed Case 3:13-Cv-1423-JAM

## That Includes The Above Paragraph

This federal case was ruled on 7-19-2018 by a jury so they cannot use that as an excuse not to answer!

NOTICE:  A jury has ruled on Fed case 3-13-CV-1423-JAM filed on 7-18-2018, therefore this action is no longer in litigation, so that means **Deutsche Bank ( DB) must respond,** even if Deutsche Bank claims it is so and thus the CFPB must address this complaint.  Deutsche Bank was dismissed from the case on June 2, 2016

specifically for phone call harassment and civil breach of contract, but not on fraud that was later discovered by plaintiff.

The Terms of the Terminated invalid Original Note and the Terms of the Modified Note are below.

### The Original Note

WaMu as Servicer of the Original Note Principle and Interest Statement on 8-28-2007 was $9, 636.75.  See **EXHIBIT 6.**

### The Modified Note

Feb 7, 2013  Five years after Chase becomes Servicer they show that they are billing plaintiff Lundstedt for the Principle and Interest $10, 250.94 per month.  The $10, 250.94 monthly payment was created by the concealed 5-1-2008 Modified Note That Was Never Recorded In Town Land Records Or Disclosed To The State Court Foreclosure Which Makes The State Foreclosure Judgment Of 9-16-2013 Null Invalid Or Void..  **See EXHIBIT 7**.

Chase as Servicer for creditor Deutsche Bank ALSO Offers to Modify the Original Note that would start on 4-1-2013 $15, 613.00 when plaintiff Lundstedt could only afford $500 per month.  See **EXHIBIT 7.**

See **EXHIBIT 8** for an example of how to Record a Modification of Agreement.

Then, in **EXHIBIT9**, notice that there is no Recordation of the unsuitable Modified Note.

### CHRONOLOGY OF COMPLAINT

### 2006

Mid 2006 - WaMu's now defunct mortgage referral broker Mariners Capital, Inc. of Newport Beach, California called Plaintiff Borrower Peter Lundstedt, ("Plaintiff Lundstedt"), of Greenwich, CT in 2006 to solicit a $1 million Securitized Note and Security Instrument mortgage loan that was slated for WaMu's Long Beach Mortgage Loan Trust 2006-10 because the investment window was closing in November 2006. WaMu and Mariners Capital, Inc. together allegedly charged plaintiff Lundstedt over $100,000 in fees and commissions.

8-2006  WaMu proposes a high a sub-prime interest rate quote of 11.150%,  with a maximum interest rate of 17.5%, on the basis that plaintiff Lundstedts' credit score is near 600.

8-2006  Plaintiff Lundstedt questions the score and the rate, then checks with the big three credit agencies and finds that his score is approximately 700.  But, WaMu's mortgage broker tells plaintiff that WaMu uses a different real estate credit scoring company and that is why his credit score is 100 points below the big three, but then compensates for that by telling plaintiff he can just refinance in six months.

9-25-2006  The parties then enter into a 9-25-2006 agreement, but then neither WaMu nor Deutsche Bank as Trustee sends plaintiff Lundstedt the required FCRA, TILA and Reg Z Credit Score Disclosure Notice required to be sent before contract signing.

9-2007  Plaintiff Lundstedt discovers this a year later upon information from the internet and contacts WaMu.  WaMu sends plaintiff Lundstedt the Credit Score Disclosure Notice a year late on 9-17-2007 in violation of FCRA, TILA and Reg Z.  See WaMu Credit Score Disclosure in EXHIBIT 1.

9-2006  The Significance of the omission of the mandated FCRA, TILA and Reg Z Credit Score Disclosure Notice is:

 …Had WaMu sent plaintiff Lundstedt the required and mandated TILA and Reg Z Credit Score Disclosure Notice in the beginning, he could have avoided an outrageous duration of ten years of severe emotional and physical hardship, emotional anguish and distress from the physical pain that resulted.  Because Deutsche Bank as Trustee was Negligent, they are liable for damages and injuries to Mr. Lundstedt.

**CREDITORS MUST MAKE ADDITIONAL DISCLOSURES.**

Because the required Credit Score Disclosure was not sent, and because Deutsche Bank as Trustee reviewed plaintiff Lundstedts' file that contained a copy of the late Credit Score Disclosure when Deutsche Bank as Trustee," as the creditor", created plaintiff Lundstedts' 5-1-2008 Modification, Deutsche Bank as Trustee is liable to Mr. Lundstedt for damages stemming from the unsuitability of the Modification, because the Modification increased plaintiff Lundstedts' monthly payment from $9,636.75 to $10, 250.94 in 2008, When Mr. Lundstedt Could Only Afford $500 A Month!, after which Chase recommended an unsuitable increase to an outrageous sum of

$15,613.00 in 2013, When Mr. Lundstedt Could Only Afford $500 A Month! See 15 U.S. Code § 1681g below:

U.S. Code › Title 15 › Chapter 41 › Subchapter III › § 1681g

15 U.S. Code § 1681g(g)(D)(1)(g)(1)(D) - Disclosures to consumers

## (g) DISCLOSURE OF CREDIT SCORES BY CERTAIN MORTGAGE LENDERS

(D) Notice to home loan applicants

(1) In general

## (g) Disclosure of credit scores by certain mortgage lenders

(1) In general - Any person who makes or arranges loans and who uses a consumer credit score, as defined in subsection (f), in connection with an application initiated or sought by a consumer for a closed end loan or the establishment of an open end loan for a consumer purpose that is secured by 1 to 4 units of residential real property (hereafter in this subsection referred to as the "lender") shall provide the following to the consumer as soon as reasonably practicable:

### (D) Notice to home loan applicants

A copy of the following notice, which shall include the name, address, and telephone number of each consumer reporting agency providing a credit score that was used:

"Notice to the home loan applicant"

"In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores.

"The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending

on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change.

"Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

"If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

"If you have questions concerning the terms of the loan, contact the lender."

**(2) Prohibition on disclosure clauses null and void**

(A) In general - Any provision in a contract that prohibits the disclosure of a credit score by a person who makes or arranges loans or a consumer reporting agency is void.

## LIABILITY FOR VIOLATIONS OF THE FCRA

Failure to comply with the FCRA can result in state government or federal government enforcement actions, as well as private lawsuits. Sections 616, 617, and 621. In addition, any person who knowingly and willfully obtains a consumer report under false pretenses may face criminal prosecution. Section 619.

-------------------------------------------------------------------------------------------

**Duties After Notice of Dispute from Consumer**

If a consumer notifies a furnisher, at an address specified for the furnisher for such notices, that specific information is inaccurate, and the information is, in fact, inaccurate, the furnisher must thereafter report the correct information to the CRAs. Section 623(a)(1)(B).

If a consumer notifies a furnisher that the consumer disputes the completeness or accuracy of any information reported by the furnisher, the furnisher may not

subsequently report that information to a CRA without providing notice of the dispute. Section 623(a)(3).

Furnishers must comply with federal regulations that identify when an information furnisher must investigate a dispute made directly to the furnisher by a consumer. Under these regulations, furnishers, must complete an investigation within 30 days (or 45 days, if the consumer later provides relevant additional information) unless the dispute is frivolous or irrelevant or comes from a "credit repair organization." Section 623(a)(8). Federal regulations are available at www.consumerfinance.gov/learnmroe. Section 623(a)(8).

---

**Duties After Notice of Dispute from Consumer Reporting Agency**

If a CRA notifies a furnisher that a consumer disputes the completeness or accuracy of information provided by the furnisher, the furnisher has a duty to follow certain procedures. The furnisher must: Conduct an investigation and review all relevant information provided by the CRA, including information given to the CRA by the consumer. Sections 623(b)(1)(A) and (b)(1)(B). Report the results to the CRA that referred the dispute, and, if the investigation establishes that the information was, in fact, incomplete or inaccurate, report the results to all CRAs to which the furnisher provided the information that compile and maintain files on a nationwide basis. Section 623(b)(1)(C) and (b)(I)(D). Complete the above steps within 30 days from the date the CRA receives the dispute (or 45 days, if the consumer later provided relevant additional information to the CRA). Section 623(b)(2). Promptly modify or delete the information, or block its reporting. Section 623(b)(1)(E).

See: https://www.ecfr.gov/cgi-bin/text-idx?SID=af5a445c4f88d222cb631a19cc8428e1&mc=true&tpl=/ecfrbrowse/Title16/16cfr682_main_02.tpl See: http://www.creditreporting.com/fair-credit-reporting-act/

**Congressional findings and statement of purpose -15 U.S. Code § 1681 -**

(a) Accuracy and fairness of credit reporting The Congress makes the following findings:

(1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and

unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(3) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(4) There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

(b) Reasonable procedures

9-25-2006 Plaintiff had no knowledge of the Credit Score Disclosure requirement, and is then sold on the idea of paying off debt and refinancing in six months because he was starting his stand alone equity management investment company.   WaMu and plaintiff Lundstedt closed on the agreement on 9-25-2006.  See The Original 9-25-2006 Note and Security Instrument that secured the property in **EXHIBIT 2 starting on page 3**.

10- 2006 Plaintiff starts paying $9,636.75 per month.  See WaMu Escrow Statement in **EXHIBIT 3**.  Compare with **EXHIBIT 4**.

**2007**

**3-2007** Plaintiff Lundstedt calls WaMu to refinance his loan as promised.  WaMu says they do not remember giving that oral agreement.

**9-2007** Plaintiff Lundstedts' income declines and he could not make his October 2007 $9,636.75 monthly payment on his $1 million mortgage.  In good faith, plaintiff Lundstedt calls the servicer WaMu and discloses that he is having problems making the monthly payment and asks for assistance in modifying his loan down to, first $5,000 then to $500 a month so that he could get back on his feet.  WaMu ignors him.

**9-2007** A week later, WaMu places plaintiff Lundstedts' phone numbers into a harassing automated dialing collections calling program and starts calling him relentlessly from Sep 2007 until Mar 2008 in order to pressure him to pay off the loan.

**Dec 5, 2007** WaMu "partially" accelerates plaintiff Lundstedts' loan because doing it partially allegedly does not trigger the whole acceleration.  See **EXHIBIT 4.**

**2008**

**Feb. 2008**  WaMu initiates wrongful foreclosure on plaintiff Lundstedts' "Original" Loan Note because they did not address their violations of TILA by not sending plaintiff Lundstedt his Credit Score Disclosure in the beginning.

**Mar 2008** Plaintiff Lundstedt again notifies WaMu of the tainted Original Note and shows them their failure to properly send him a Credit Score Disclosure required under FCRA, TILA, Reg Z and X.

**Mar 2008**  Without reason, WaMu withdraws its foreclosure complaint and the WaMu phone calls stop.

**Mar 2008**  WaMu decides to modify plaintiff Lundstedts' Original loan and adds a new clause that eliminates WaMu and Deutsche Banks liability for the Original Note after plaintiff Lundstedt complained.

**Apr 8, 2008**  WaMu Assigns the ownership of the Note for $1, from Long Beach Mortgage Loan Company to Deutsche Bank as Trustee for Long Beach Mortgage Loan Trust 2006-10 because WaMu sees the writing on the wall and anticipates bankruptcy and wishes to avoid having plaintiff Lundstedts' Note tied up in bankruptcy.  See **EXHIBIT 2 page 26**.

**Apr 2008**  WaMu creates a new Modified Note and Security Instrument and sends plaintiff Lundstedt a copy to sign.  Plaintiff Lundstedt is called by a Deutsche Bank lawyer asking if plaintiff Lundstedt signed the Modification. Plaintiff Lundstedt asks what if he does not sign it.  The Deutsche Bank lawyer tells him they will foreclose on him and eject plaintiff Lundstedt out on to the side walk. Plaintiff Lundstedt felt terrorized.

**Apr 29, 2008**  Plaintiff Lundstedt signs the 5-1-2008 Note under duress.

**May 6, 2008** Deutsche Bank representatives sign the Modified Note in front of Notary's.  See EXHIBIT **5**.

**May 2008**  Deutsche Bank as Trustee and WaMu Fail to Record the 5-1-2008 Modification Note in the Town of Greenwich CT Land Records, where a few weeks

earlier they had Recorded the Assignment. See **EXHIBIT 8** for an example of how to Record a Modification of Agreement. Then, in **EXHIBIT 9**, notice that there is no Recordation of the unsuitable Modified Note.

**May 2008** Deutsche Bank as Trustees' 2008 motive in putting plaintiff Lundstedt into the 5-1-2008 Modification was to conceal and terminate the material 9-25-2006 Terms and Conditions because plaintiff Lundstedt told WaMu that there was credit score fraud in the origination of the original Note and Security Instrument, that they had not sent out the Credit Score Disclosure in order to close the loan deal so that they could earn fees and commissions of over $100,000 in 2006.

**June 2008** They further implicated themselves as to their intention to escape liability by concealing and not filing the Modified Note and Security Instrument in the Greenwich, CT Town Land Records as required by law. See**: EXHIBITS 4 and 5.**

**Sep 26, 2008** Chase becomes the "New Servicer" for the Notes creditor and owner Deutsche Bank as Trustee to the 5-1-2008 Modification that was NOT Recorded in the Town Land Records by Deutsche Bank or WaMu. Chase decides to follow their lead and makes the decision to NOT Record the Modified Note and Security Instrument in the Greenwich, CT Town Land Records.

**Sep 25, 2008** WaMu as Servicer declares bankruptcy and the FDIC takes over.

**Sep 26, 2008** The next day, Chase acquires WaMu's collections department and becomes the new Servicer and begins aggressive calling and litigation to convince Mr. Lundstedt to pay the approximate $1.25 million balance. Mr. Lundstedt is unable to pay and tells Chase the same thing he told WaMu, that he could not afford the loan and could not pay money to the servicer for the owner and trustee of the Note, Deutsche Bank. Plaintiff Lundstedt subsequently suffers severe emotional distress from five years of Chase harassment calls after he told Chase to stop calling repeatedly.

**Dec 4, 2008** Chase instructs Deutsche Bank as Trustee to foreclose on the invalid Original Notes Terms and Conditions dated 9-25-2006, then omits and conceals filing the Modified Note because it shows proof of Deutsche Bank pushing plaintiff Lundstedt into a highly unsuitable Modification for the sole purpose of adding an indemnification clause for themselves. But because Deutsche Bank filed on a Note with invalid terms, it makes the judgment of 9-16-2013 null, invalid or void.

**Sep 2008** Chase takes over Servicing and accepts the Terms of the Modified Note even though Chase sued on the terminated Terms of the Original Note and continues the concealment of the Modified Note from the public until May 2013 when SPS, Inc. as the new Servicer takes over and continues the concealment for another three years.

**May 1, 2013** Chase is replaced by SPS, Inc. as Servicer to the Note and eventually sells Mr. Lundstedts' property on 1-2-2017 after plaintiff Lundstedt spends five years fighting to defend himself from the bank abuse.

**May 1, 2013** Select Portfolio Servicing, Inc. becomes the new servicer in part because Chase was violating the FDCPA for five years by making hundreds of harassing calls to plaintiff Lundstedt because Chase was a debt collector who did not own the Note. Deutsche Bank as Trustee owned the Note. Deutsche Bank as Trustee did not call plaintiff Lundstedt. That was left to first WaMu then Chase. But SPS, Inc. also knew of and concealed the unsuitable and illegal Modified Note from the public and the court when they directed their attorney to file a wrongful foreclosure by using a Note with expired Terms and Conditions.

**CONCEALMENT AND OMISSIONS**

**Deutsche Bank (DB) was Trustee AND Owner of the Long Beach Mortgage Loan Trust 2006-10 that held plaintiff Lundstedts' 9-25-2006 $1,000,000 Original Note and Security Instrument, in EXHIBIT 2 page 3, AND the parties 5-1-2008 Modified $1,072,000 Note and Security Instrument in EXHIBIT 5 that was collateralized by plaintiff Lundstedts' home in Greenwich, CT.**

**The Modification was created by DB as Trustee who insisted that plaintiff Lundstedt sign it in May of 2008, who did so, but only under duress of ejection and foreclosure from DB and WaMu, and only then did plaintiff Lundstedt reluctantly agree to the 5-1-2008 terms, see EXHIBIT 5.**

**That, "signed and notarized 2008 agreement", created a new installment contract and a new starting point for the 5-1-2008 new materially modified installment contract terms and conditions.**

**The DB and Plaintiff Lundstedt 5-1-2008, Jointly Signed, "Operative" Note and Security Instrument had different "Material" Terms, Duration and Face Amount that replaced the terminated Original 9-25-2006 installment contract**

terms and conditions. The 2006 "Terminated" Invalid Note and Security Instrument with Materially different Terms, Duration and a different Face Amount was "replaced" by the 2008 Materially different Terms, Duration and Face Amount Note and Security Instrument contract.

Subsequently, on 12-18-2008, Chase directed DB to file a complaint of foreclosure on the 9-25-2006 Terms, Duration and Face Amount, that were terminated, but did not disclose the Modified Operative Materially different Terms, Duration and Face Amount agreed to on the new 5-1-2008 agreement insisted upon by DB.

DB as Trustee changed plaintiff Lundstedts' monthly required Principle and Interest payment "UP", from $9,636.75 to $10,250.94, when plaintiff Lundstedt could only afford $500 a month. DB as Trustee then put in an indemnification clause in the Modified Note for any wrong doing committed by DB in the Original Note whose 9-25-2006 terms and conditions were then terminated on 5-1-2008.

What DB should have done in 2008 was give plaintiff Lundstedt a loan he could afford so that he could prosper rather than be subjected to five years of collection harassment from Chase at the direction of DB as Trustee and Owner of the Note.

DB as Trustee and Pierre-Yves Kolakowski concealed, omitted and did not disclose the materially different Modified Note from the 12-18-2008 foreclosure filing.

DB as Trustee and Pierre-Yves Kolakowski concealed, omitted and did not disclose the materially different Modified Note from the Town of Greenwich, CT Land Records.

But, consider that in a recent federal court case between the parties, Chase filed, as an exhibit at trial, the 5-1-2008 Modified Contact as evidence, and omitted the 9-25-2006 Original Note and Security Instrument that Chase and DB claimed was the operative Note in their 12-18-2008 foreclosure complaint!

So, in DB's 12-18-2008 foreclosure complaint against plaintiff Lundstedt in 2008, Chase instructed DB a file on the Original 9-25-2006 tainted Note with terminated material Terms and Conditions, thereby deliberately concealing

and omitting the 5-1-2008 tainted Modified Note that represented the legal contract between the parties. The Modified contract was created by DB as the Trustee who insisted that plaintiff Lundstedt sign it in 2008 under duress.

BUT then, in plaintiff Lundstedts' 2013 complaint filed against DB and Chase, Chase, at the 2018 trial, discloses the 2008 Modified Note representing the Modified Note was the parties contractual agreement, and then, incredibly, conceals and omits the 9-25-2006 Original Note from the 2018 trial exhibits that they used in their 12-18-2008 foreclosure complaint that omitted the 5-1-2008 Modified Note.

Chase and DB admitted into evidence only the Original 2006 Note, and omitted the 2008 Modified Note, in the parties 2008 state case, BUT THEN omit the Original 2006 Note and admitted the 2008 Modified Note in the parties' 2013 case giving the appearance that the operative contract was the modified 2008 contract that they concealed from the 2008 state case.

So Chase and DB, in the 2008 CT state case, represented that the parties binding agreement with four corners was the 2006 Original agreement signed on 9-25-2006, but then represent in the 2018 federal case the parties binding agreement with four corners was the 2008 Modified agreement signed on 5-1-2008. Yet Chase and DB omitted the 2008 Modified Note in the 2008 state case and admitted it in the 2013 case.

That opens the door for examination of the contracts on review, appeal or in a new trial on the 2013 federal case.

Oct 24, 2013 Deutsche Banks' attorney, Pierre-Yves Kolakowski, allegedly had a junior member of his firm, Annabelle T. Machado-Costa, Esq., sign the false Foreclosure Certificate, in EXHIBIT 2 page 27, that the 9-25-2006 Original Terms, Conditions, Face Value and Duration EXHIBIT 2 page 3 was valid.

Pierre-Yves Kolakowski knew the Materially Different 5-1-2008 Modified Terms, Conditions, Face Value and Duration in EXHIBIT 5 was highly unsuitable for Mr. Lundstedt and illegal.

In other words, Pierre-Yves Kolakowski as supervisor and his firm knew that they Certified a Foreclosure that had expired Terms, Conditions, Face Value and Duration, in scienter.

**This Certificate of Foreclosure Certified the terminated invalid unlawful "terms and agreements" of 9/26/2006.  Pierre-Yves Kolakowski as supervisor and his firm then filed the false foreclosure certification in the Town of Greenwich Land Records by, when the only legal or valid "terms and agreement" were those signed to  on 5/6/2008 by Deutsche Bank as Trustee.**

**Conclusion**

Deutsche Bank caused plaintiff Lundstedt ten years of severe mental and physical pain, suffering, anguish and ten years of lost income of $2 million and ten years of lost opportunity of $9 million and pain and suffering of $10 million.

The public has a right to see the modified 5/1/2008 contract, but it was not filed in the Town of Greenwich Land Records because Deutsche Bank as Trustee of the Note allegedly planned to conceal it from public and regulatory and the CT state courts view.

Peter Lundstedt
Box 8122
Greenwich, CT  06836
203 733 0311